Alexander, J.
(dissenting). In my view, the "design-build” contract at issue, under which J.M. Weller Associates, Inc. (J.M. Weller) — a business corporation not licensed under article 15 of the Business Corporation Law to practice engineering or architecture — agreed to furnish architectural, engineering, and construction services to the owners, Claude and Lesley Charlebois, clearly violates the public policy of New York State and should be declared void and unenforceable. Furthermore, I believe that by sanctioning this contractual arrangement, the majority does violence to the comprehensive professional licensing scheme enacted by the Legislature and frustrates the long-standing policy of this State prohibiting the indirect rendering of professional services by unlicensed business corporations. Accordingly, I respectfully dissent.
In order to protect the life, health and property of New York State citizens, the Legislature has enacted a comprehensive licensing scheme regulating the rendering of professional services to the public (American Store Equip. & Constr. Corp. v Dempsey’s Punch Bowl, 174 Misc 436, affd 258 App Div 794, affd 283 NY 601; see, People v Merriweather, 135 Misc 2d 998, 1000; Wineman v Blueprint 100, 75 Misc 2d 665, 666). Under the statutory scheme, only persons licensed as architects or engineers may practice those professions (Education Law §§ 7202, 7302) and "[ajnyone not authorized to practice * * * who practices or offers to practice or holds himself out as being able to practice” architecture or engineering is guilty of a class E felony (Education Law § 6512).
Article 15 of the Business Corporation Law prescribes the exclusive means by which professionals may practice in the corporate form. A professional service corporation must have attached to its certificate of incorporation "a certificate or certificates issued by the licensing authority certifying that each of the proposed shareholders, directors and officers is authorized by law to practice” the particular profession (Business Corporation Law § 1503 [b]). Moreover, such corporation may not "engage in any business other than the rendering of the professional services for which it was incorporated” (Business Corporation Law § 1506). Conversely, a corporation not licensed to render professional services may not do so unless *597 specifically authorized by statute, either because it is expressly permitted to retain licensed professionals for this purpose (see, e.g., Education Law §§ 6808 [pharmacy], 7106 [optometry], 7122 [ophthalmic dispensing], 7802 [massage]), or because it practiced the profession at a time when such practice was authorized by law (see, Education Law § 7209 [6] [engineering]; § 7307 [4] [architecture]).
It is undisputed that J.M. Weller is not licensed as a professional architectural and engineering corporation, it does not enjoy the benefit of any special statutory authorization to practice those professions through licensees, and it is not a "grandfathered” corporation under the relevant statutory provisions. Nevertheless, the majority concludes that the "design-build” contract does not offend the State’s public policy because it provides that a licensed professional engineer will perform all architectural and engineering services.[1] As explained below, by improperly focusing exclusively on who performs the professional services, the majority permits unlicensed contractors to circumvent the statutory scheme and thereby accomplish exactly what the Legislature has declared impermissible.
The majority’s unduly restrictive view of the public policy concerns underlying the licensing statutes is most disturbing. These concerns are clearly not adequately protected merely because the contract requires that the architectural and engineering services be performed by a licensed professional. Bare "performance” in some otherwise undisclosed and undefined manner is manifestly insufficient where, as here, the licensed professional is also president of the unlicensed business corporation and, presumably, is beholden to that profit-motivated commercial enterprise. The purpose of a license goes beyond merely ensuring that the services will be performed by a professional; a license is intended also to guarantee that any *598 services performed will be rendered in the exercise of independent professional judgment uninhibited by any outside influence or control. Surely, protection of the public health and safety depends at least as much on the professional independence of licensees as on their professional competence.
It is unrealistic to assume that the head of a construction company who, in managing that company’s construction contract, must be concerned with time and cost restraints, allocation of resources, and profit margins, will somehow remain unaffected by these concerns simply by donning his other hat and assuming the role of professional engineer. Indeed, the interrelated nature of the "design-build” contract at issue makes this kind of distancing impossible; the fees paid by the owner for architectural and engineering services are defined as a percentage of the total project cost, thus making the financial interests of the licensee inseparably wedded to those of the contractor. Therefore, it cannot be said with any confidence that the licensee will not subordinate the owner’s interests to those of his corporate employer. Especially is this true where the terms and conditions under which the architect/ engineer is retained by the contractor are undisclosed. Where there is neither contract nor privity directly between the professional licensee and the client, it is virtually impossible for the licensee to maintain a professional relationship of trust and confidence (see, Matter of Co-operative Law Co., 198 NY 479, 484). "His master would not be the client but the corporation, conducted it may be wholly by laymen, organized simply to make money and not” to render professional services of the highest caliber (Matter of Co-operative Law Co., 198 NY, at 484, supra). By ensuring that licensed professionals render unfettered independent judgment, the licensing statutes are designed to protect owners against the adverse consequences that may result from precisely this type of divided allegiance.[2]
Neither Bronold v Engler (194 NY 323) nor Vitanza v City of New York (48 AD2d 41, affd on opn below 40 NY2d 872) *599 offer any support for the result reached by the majority. Both those cases involved the application of section 45 of the General City Law prohibiting unlicensed persons from performing plumbing work. In Bronold, contrary to the assertion of the majority (majority opn, at 593), we held in the circumstances of that case, that no recovery may be had under a plumbing contract where the contractor is not properly licensed even if a licensed master plumber is employed as a manager in the business. Similarly, in Vitanza, we held that where the contractor is not properly licensed, it may not perform the plumbing work indirectly through a licensed plumber retained for this purpose. Thus, far from validating the "design-build” contract at issue here, both cases would appear to support just the opposite conclusion: namely, that the contractor may not avoid the licensing requirement by the simple expedient of employing a licensed professional in its construction business.
The majority mistakenly relies on an exception referred to in each case permitting an unlicensed contractor to retain licensed plumbers where "the builder contracts to erect a structure, including the plumbing work, for an all-inclusive sum and the plumbing work may be considered 'the mere incident of a larger work’ ” (Vitanza v City of New York, 48 AD2d, at 45, supra [quoting Bronold v Engler, 194 NY, at 325, supra]). The proscriptions against the unauthorized practice of engineering and architecture, however, unlike those relating to plumbing, extend not only to those who practice without a license but also to those who "[offer] to practice or [hold themselves] out as being able to practice” (compare, General City Law § 45; and Education Law § 6512). Thus, there is no justification for concluding that the above exception, arising under the licensing provisions of the General City Law, has any relevance to the instant case. Even if the exception alluded to were relevant, it cannot operate here, not only because the provision of architectural and engineering services for the agreed upon construction project can hardly be characterized as a "mere incident of a larger work” (Bronold v Engler, 194 NY, at 325, supra), but also because architecture and engineering, as distinguished from plumbing, qualify as "learned professions” that may not be practiced indirectly through licensees (see, Matter of Co-operative Law Co., 198 NY, at 484, supra).
In Matter of Co-operative Law Co., we considered and applied the "learned professions” principle in holding that an *600 unlicensed business corporation may not practice law through licensed attorneys: "A corporation can neither practice law nor hire lawyers to carry on the business of practicing law * * * The legislature in authorizing the formation of corporations to carry on 'any lawful business’ did not intend to include the work of the learned professions * * * Business in its ordinary sense [is] aimed at, not the business or calling of members of the great professions, which for time out of mind have been given exclusive rights and subjected to peculiar responsibilities” (Matter of Co-operative Law Co., 198 NY, at 484-485, supra). Engineering and architecture are indisputably among the learned professions which are closely regulated by the State Board of Regents and the State Department of Education (Education Law §§6506, 6507, 6508, 7205, 7303). Practitioners must be of good moral character, possess a bachelor’s or higher degree, have several years of practical work experience, and pass a rigorous examination in order to qualify for a license (Education Law §§ 7206, 7304). Thus, inasmuch as an unlicensed business corporation may not practice architecture or engineering directly, it may not do so indirectly by retaining licensed professionals "as that would be an evasion which the law will not tolerate” (Matter of Cooperative Law Co., 198 NY, at 483, supra).
The current licensing provisions contained in title 8 of the Education Law are the product of five years of study by a Joint Legislative Committee formed "to revise and simplify that portion of the Education Law dealing with the professions” (Mem from Attorney-General, Governor’s Bill Jacket, L 1971, ch 987; see, Mem in support of bill, Governor’s Bill Jacket, L 1971, ch 987). Thus, in the absence of explicit statutory authorization permitting unlicensed business corporations to practice architecture and engineering through licensees, there is no reasoned basis for inferring that the Legislature intended to permit such practice. Yet, notwithstanding the clearly articulated legislative intent, as reflected in title 8 of the Education Law and article 15 of the Business Corporation Law, today the majority has permitted J.M. Weller to do that which law and public policy expressly prohibits. By endorsing the "design-build” agreement, the majority has, in my judgment, enervated this licensing scheme by seyerely diminishing the protections it was intended to provide. Accordingly, I would reverse the order of the Appellate Division and grant plaintiffs’ motion for summary judgment.
*601 Chief Judge Wachtler and Judges Kaye and Hancock, Jr., concur with Judge Bellacosa; Judge Alexander dissents and votes to reverse in a separate opinion in which Judges Simons and Titone concur.
Order affirmed, with costs.

. Although the contract at issue here makes reference to a secondary agreement between the contractor and the architect/engineer, there is absolutely no evidence in the record that any such agreement was ever entered into, let alone any indication as to its terms and conditions. Particularly absent is any provision explaining the professional obligations of the engineer vis-á-vis the Charleboises. Notably, the only signatures on the contract are those of J.M. Weller and the Charleboises; although James M. Weller, P.E. is named in the contract as the architect/engineer, his signature appears only in his representative capacity as president of J.M. Weller. Thus, although the named engineer may well have performed the work, the Charleboises were essentially at the mercy of the contractor in respect to the nature and extent of the licensee’s contractual obligations.

. Although, as recognized by the majority (majority opn, at 592), a licensee may be disciplined by the State Board of Regents if found guilty of professional misconduct, this statutory protection, though important, is triggered only by carefully delineated and egregious forms of behavior (Education Law §§ 6509, 6511), and is inadequate to serve the more general statutory purpose of ensuring that owners receive the best efforts and undivided loyalty of the professional licensee. The same may be said of a client’s ability to sue the professional licensee in tort for malpractice.